GEORGE MAXWELL and RACHEL his wife, late RACHEL PIT-TENGER, Adm'rs of ABRAHAM PITTENGER, dec'd, v. MAR-GARET PITTENGER, Adm'x of CORNELIUS PITTENGER, dec'd, and others, his heirs at law.

A decree for the specific performance of a contract will not be refused on the ground that the purchaser was intoxicated at the time of the sale, unless it appear that such intoxication was produced or procured by the vendor, or that an undue advantage had been taken of the situation of the purchaser.

If the vendor is ready at the time appointed to perform his part of the contract, and offers to do it, it is sufficient.

If a deed is to be given, and the vendor is present prepared to sign it, and the one who is to receive it positively declines, there is no need of a formal execution and tender.

* A decree of the orphans' court, ordering an administrator to sell the whole or so much of the lands of the intestate as will be sufficient to pay the debts, will be reversed as erroneous and unlawful.   But such decree cannot be impeached collaterally, or treated as a nullity;

THE bill in this cause was filed to enforce the specific performance of a contract for the purchase of certain real estate, sold at public sale by the administratrix of Abraham Pittenger, deceased, by virtue of an order of the orphans' court of the

* See *Diehl et al.* v. *Page et al.*, ante, 142.

[Pittenger's Adm'r v. Pittenger et al.]

county of Somerset, and purchased by Cornelius Pittenger in his life time. The purchaser refused to accept the title or to pay the purchase money. An answer was filed by the administratrix, admitting the sale, but insisting that it was illegal and fraudulent. The particular grounds of defence appear in the opinion of the chancellor.

The cause came on for hearing upon the pleadings and proofs.

*Wall,* for complainants.

*J. S. Green,* for defendants.

Cases cited by the defendants' counsel. 3 *Atkyns,* 389; 13 *Vesey,* 25; 1 *Vernon,* 227; *Prec. in Chan.* 538; 1 *Vesey,* 565; *Wilmurt* v. *Morgan,* (*Opin. of Ch. Williamson,*) cited in 4 *Halsted,* 341; 6 *Halsted,* 344; *Rev. Laws,* 435, sec. 19, 20; *Hals. Dig.* 248; 18 *Vesey,* 13, *note;* 18 *Vesey,* 12; 6 *T. R.* 642; *Cowper,* 395.

THE CHANCELLOR. In the term of May, 1827, the orphans' court of the county of Hunterdon, granted to Rachel Pittenger, administratrix of the estate of her late husband, Abraham Pittenger, an order to sell certain real estate in the county of Hunterdon, for the payment of debts; and in the term of June of the same year, the orphan's court of the county of Somerset granted to her a similar order, to sell real estate in that county. By virtue of these several orders, she advertised, and on the twenty-seventh day of September, 1827, sold to Cornelius Pittenger the undivided right of a certain farm lying in Hunterdon and Somerset, then in possession of the said Cornelius Pittenger, for the sum of nine hundred dollars. The purchaser on the same day signed a note or memorandum in writing, acknowledging the purchase, and soon after, and before the time for paying the purchase money and executing the deed, departed this life, intestate. The bill is filed against the administratrix and the heirs at law, for a specific performance.

[Pittenger's Adm'r v. Pittenger et al.]

The defendant, Margaret Pittenger, has put in an answer to the bill, admitting the sale, but denying that it was fair, legal or binding; and insisting that the said Rachel Pittenger, one of the complainants, and her agents, practised a fraud upon the said Cornelius Pittenger, by giving and suffering to be given to him spirituous and other strong liquors, so as to produce intoxication, and thereby rendering him unable to understand the nature of the conditions of sale; that he purchased the property, as defendant believes, free from all legal incumbrances and the widow's right of dower, and under that impression signed the article or memorandum acknowledging the sale. She sets up further in the answer, that the complainants employed one or more persons as puffers to bid for the property, without declaring that she did so, thereby practising a fraud upon the purchaser, and compelling him to give more than the property was worth, even if clear of incumbrances.

From this analysis of the answer, it appears that the defendant seeks to avoid the contract, in the first place, on the ground of fraud practised by the vendor in giving and suffering to be given spirituous and other strong liquors to the purchaser, so as to produce intoxication, by which he was rendered unable to understand the conditions of sale.

The allegations of the defendant, in this behalf, are not sustained by the proof.

Whether or not Cornelius Pittenger, the purchaser, was, at the time of the sale, so far under the influence of liquor, as not to be able to act understandingly and correctly, has been made a question, and there is considerable evidence on both sides. One of the defendant's witnesses states, that Pittenger, during the vendue, drank freely of what he believes was cider spirits, and was very much intoxicated when the property was struck off. Another one testifies, that he also saw him drink during the sale, and that he was so much in liquor as to be stupid, and did not appear to do any thing correctly; that when he signed the acknowledgment on the conditions of sale, he was so much under the influence of liquor that any one might have taken the advan-

[Pittenger's Adm'r v. Pittenger et al.]

tage of him.  A third witness, supposed him to be a good deal worse for liquor while bidding; thought he was not fit to bid, and that he did not know what he was about.  A fourth, testifies to his having been at a distillery in the morning of the day of sale; that he was as much in liquor when he went away to go to the vendue, as witness ever saw him, and that he took with him two jugs containing three quarts of liquor.  On his cross-examination he said, he thought any one could have told he was in liquor when he left the distillery.  He could not go very straight.

On the part of the complainants it is proved, that Pittenger came to the house of the complainant, where the vendue was to be held, before dinner, and dined with those who were there; and one of the complainant's witnesses says he was sober, and, as witness considered, perfectly capable of transacting business. Another witness says, that Pittenger appeared to understand, and, no doubt, did understand what he was about; that he was sufficiently sober to understand himself perfectly.  Witness would have had no hesitation in doing business with him at that time. *Andrew Weart*, another witness of the complainant, and the crier of the vendue, says, Pittenger was a man of intemperate habits; that when witness first came to the sale, he considered Pittenger as regular as he generally was.  He saw him drink nothing during the sale.  He further states as follows:—"After the sale, and when Cornelius signed the conditions, he appeared to me to be as regular as he had been during the sale.  For my part, I did not see any alteration in him; at that time he was as cautious and as capable of doing business as at any time, as I thought, and as far as I could see.  Several weeks after that, he came to me to do some business with me, and was capable of doing business, and did it with me very correctly; and he was as capable of doing business at the sale as he was then.  I should have had myself no hesitation to make a contract with him in the condition in which he was at the sale."

I think it evident from the testimony, that Pittenger had been drinking, and perhaps drinking freely; but that he was in such

a situation as to be unable to act understandingly, is not satisfactorily made out. The witnesses differ in opinion; but the facts of the case, as extracted from the testimony generally, are against the proposition. For instance, Pittenger came to the sale with the view of purchasing the property. It was an undivided moiety that was to be sold, and he owned the other part of it. Before the sale commenced, and when Mr. Maxwell proposed that the property should be sold without written conditions, and an article of agreement signed afterwards, he, Pittenger, objected to it. He wanted to know how, and what he was to buy. During the sale, he bid cautiously and deliberately; more so, the crier thought, than others. After the sale, and before signing the memorandum on the back of the conditions, he attended to the reading of it; and not satisfied with that, he asked Mr. Maxwell for his spectacles, and read it for himself. He made no objection to the subscription or the purchase. When Mr. Schenck, after the sale, offered to take it off his hands, he declined, and said he bought it for himself, and that he meant to keep it. He said it suited him better than any body else, as he owned one half of the property. He said a family might come in, that would give a good deal of difficulty, and it was best to own it himself. After the business was completed, he took tea with the family, in company with George Maxwell and William Collings, who both testify to his capacity. After tea, he started to walk home, and being overtaken by Thomas Allen, who was in a wagon, he stopped him, got into his wagon, and rode home; then got out without any assistance, and walked into the house.

These facts, taken together, show that Pittenger, throughout the whole, acted as a sober, rational and intelligent man would act. And when, in addition to this, it is seen that no evidence is adduced to prove that he gave more for the property than its value, the fair conclusion is that he acted understandingly, and that, even if he had indulged pretty freely in the use of ardent spirits, he was competent for business.

It is satisfactory to reach this result, though it was not necessary to sustain the plaintiffs' claim. For if the defendant had been

able to prove conclusively that the purchaser was intoxicated, it would not have avoided the sale, unless the defendant could have shown that such intoxication was produced or procured by the complainant, or that an undue advantage had been taken of his situation. This principle, which was first adopted, substantially, by lord Hardwicke in 1747, has been recognized in the English chancery in later cases; as for instance, by lord Eldon in *Cooke* v. *Clayworth*, 18 *Vesey*, 12; and was adopted in this court in the case of the *Adm'rs of Wilmurt* v. *Morgan*, decided by chancellor Williamson in March, 1827, and in the later case of *Crane* v. *Conklin et al.*, decided in October term, 1831, *Saxton*, 346.

Even the defendant in her answer, does not claim to avoid the contract simply on the ground of intoxication, but because the intoxication was procured and caused by the design of the complainant; thereby acknowledging the correctness of the principle now laid down.

Supposing, however, that the conclusion arrived at is incorrect, and that Pittenger was really so much intoxicated on the day of sale, and at the time of the sale, as not to be able to act understandingly; then it is incumbent on the defendant to make out, either that such intoxication was procured or induced by the complainant, or that some improper advantage was taken of the defendant while in that situation. As to the first, the evidence is entirely insufficient. One or two of the witnesses for the defendant have sworn that there was ardent spirits on a table, and that Cornelius Pittenger drank of it. I incline to think they are correct; but it does not appear to have been the table in the room where the sale was going on. William Collings puts that matter beyond all dispute; for he states that he was in that room the whole time, with the exception of a few minutes, and there was no spirits there. I have no doubt, if liquor was actually used before the close of the sale, it was that brought by Pittenger from the distillery, as mentioned by Mr. Drake; and that it was used without the knowledge or consent, and of course without the procurement of the complainant. The evidence is full to show that

she gave none till the sale, and all business connected with it, was entirely over.

Was there any advantage taken of the situation of the purchaser, supposing him to have been intoxicated? As has been already remarked, it is not pretended that the bargain is unconsionable, or that he gave in any way too much. The property, it is admitted, suited him better than it did any one else, and was not only convenient, but in a measure necessary to the comfortable enjoyment of that part of it which he already owned. So far, then, as the price is material, there does not appear to be any valid objection to it.

But it is contended, that the purchaser was deceived as to the conditions of the sale, and that he supposed he was purchasing the property free from all incumbrances; whereas, it would appear by the articles of sale to have been purchased subject to the widow's dower, and all other legal incumbrances. Let us look into the evidence on this part of the case, and see how far the allegation is sustained. If the charge be true, the complainant can receive no countenance in this court, but must be left to her remedy in a court of law.

Foster Walters, a witness of defendant, says he heard the conditions of sale read by Mr. Maxwell. He was not so hard of hearing then as when examined, and heard them perfectly, and did not understand that the right of dower was in the conditions when they were read. He was by when Pittenger signed the indorsement on the back of the conditions of sale, and does not think any part of the conditions was read to him at that time.

Albert Terhune, another of defendant's witnesses, says he was present when Pittenger signed the memorandum, after the sale, but does not recollect that the conditions were read to Pittenger. The witness did not get to the sale until after it commenced, and he did not hear the conditions read at any time.

Another of the defendant's witnesses, John Savidge, says he perfectly understood that the part of the property which was struck off to William Collings, was sold subject to the widow's right of dower and to all incumbrances, but he *"believes he had*

"an idea" that the property in dispute was sold under different incumbrances from the property that was struck off to William Collings. Upon his cross-examination he was asked this question, Did you not tell him (Cornelius) that the property was sold subject to her (the widow's) dower right? To which he answered, I think it likely I did tell him so, for I understood it so, as that was the talk generally in the neighborhood at that time.

Such is the substance of the evidence to substantiate a grave charge of fraud against the complainant. It receives no aid from the answer, for the defendant cannot speak on this subject of her own knowledge. If it were uncontradicted or unexplained, it would scarcely be sufficient to establish so serious an allegation. But the testimony of the complainant is conclusive to show that there was not, and could not have been, any thing like fraud or deception practised.

In the first place, the articles or conditions of sale were very explicit on the subject, stating that the property was sold subject to all legal incumbrances and the widow's dower. These conditions, although not fastened up to the door, as is usual and proper, were publicly read in the presence of those who were there, and especially of Cornelius Pittenger, and were then laid on the table in the room where the people principally were.

Andrew Weart, the crier, testifies, that while he was crying the sale, he mentioned frequently that the property was subject to incumbrances; perhaps oftener than usual, that the people might understand it. He named the widow's dower and all legal incumbrances over and over. He has no doubt on his mind that Cornelius heard the conditions read, and that he also read them himself; for he (Cornelius) took them up and asked Mr. Maxwell for his spectacles, and was looking over them. He read them while the sale was going on.

William Collings, another witness of the complainant, says that Cornelius joined with Foster Waters, esquire, in insisting that there should be written conditions of sale ; and he saw Cornelius examining them after they were read. The crier repeatedly stated the conditions of the sale; more frequently, I thought,

than necessary. He named the widow's dower, and all legal incumbrances.

Again: It appears by the testimony of George Maxwell, not only that Cornelius heard the conditions read, but that he insisted on having written articles, saying, he had come to buy the property, and he wished to know what he was about; but also, that next morning after the sale, he came and asked to see the conditions, and after reading them and hearing them read, he said he was satisfied with the whole of them, only he had been told that when the widow died her children would get the dower, and he wanted to know about that. After getting the opinion of witness on that point, he said he was perfectly satisfied if that was to come to him after her death. It appears, also, that he was, before his death, in treaty with the widow for her right. Maxwell further testifies, that on the day of sale, Foster Waters wanted him to get the widow to give up her thirds: he said he thought it would sell better if there was a clear title.

This evidence places the matter beyond dispute, that so far as regards the conditions of sale, there was no fraud or deception. They were openly and repeatedly proclaimed, and could not have been mistaken.

Besides, this was an administrator's sale under an order of the orphans' court. All that could legally be sold under the order, was the right of the intestate, not the widow's dower. That remained unaffected by the order or the sale, and if nothing had been said in the conditions about incumbrances of any kind, it would be fair to presume that the purchaser would understand the sale to be subject to all legal incumbrances, unless there was some distinct and positive stipulation to the contrary.

Another ground of defence set up in the answer is, that the complainant employed puffers at the sale to run up the property, without the knowledge of the defendant. This allegation is so perfectly unsustained by testimony, that it is unnecessary to bestow upon it any consideration.

So far, then, as relates to the sale, the case is free from difficulty. It appears to have been fair, open and bona fide. The

consideration was a reasonable one, and the property suited to the wants and condition of the purchaser.

No difficulty is made about the tender of the deed in proper season. Some evidence was taken to show that it was not executed at the time by the grantor ; but as the counsel of the defendant has not in his brief adverted to it, I presume it was not intended to be urged. Whether the deed was actually executed or not, is not, in the view of the court, material. Mrs. Pittenger, on the first day of April after the sale, at which day the purchase money was to be paid and the deed delivered, went to the dwelling of Cornelius Pittenger to tender the deed. She produced the instrument, and handed it to Pittenger, who took it and read it, and afterwards handed it back. It was then read to him by William Collings, and he said he understood it. No objection was made to the instrument for not being executed. Pittenger said he believed he should not take it. The whole difficulty appears to have been about the dower. The complainant was then ready to perform her part of the contract, and offered to do it ; but the purchaser declined. This was sufficient. When money is to be paid, and the party who is to receive it refuses to take it, a formal tender is unnecessary. So, where a deed is to be given, and the party is present prepared to give it, and the one who is to receive it positively declines, there is no need of a formal execution and tender.

The complainant, then, is entitled to a decree, according to the prayer of her bill, unless another objection, not set up or adverted to in the answer, but strongly pressed in the brief submitted, shall prevail; which is, that the orders of the orphans' courts, under which the sale was made, are illegal and void.

As to the order of the orphans' court of Hunterdon, it is objected that it is illegal, inasmuch as it neither directs the whole of the land to be sold, nor does it direct any particular part or parts to be sold, but submits it to the discretion of the administratrix to sell the whole if necessary, or so much as will be sufficient. This is certainly irregular. The statute directs that when the orphans' court shall upon examination, find that a sale of all

the property is necessary, they shall direct the whole to be sold ; and that, when a part or parts will be sufficient, they shall so decree, and specify in the order what particular parts shall be exposed to sale. This decree is entirely discretionary, leaving it to the administratrix to sell either the whole or a part. Such a decree would doubtless be reversed as erroneous and unlawful; but it does not follow, that this court is to regard it as a nullity. The orphans' court had general and complete jurisdiction of the subject matter, and were acting within an acknowledged and long established province. There is a decree *in fact*, and that is sufficient for the complainant's title.

This question is not a new one in this court. In the case of *Wilmurt* v. *Morgan,* already adverted to, it came up for consideration before chancellor Williamson. In that case, as in this, the complainants were administrators seeking to carry into effect a sale made by them in their representative capacity, and the same objection to the order of sale was then made. The chancellor held the order to be irregular and liable to be reversed, but that it was not null and void, as contended for by the counsel of the defendant.

I shall be pardoned for introducing here, such part of the able opinion delivered in that case, as refers to and decides this point. " But the important point," says the chancellor, " now necessary to be decided, is, whether the proceedings of the orphans' court are absolutely void, and their order for a sale a mere nullity ; and not whether the proceedings are erroneous and irregular, and might have been set aside by the supreme court ; for the order of the court remains unreversed, and must be regarded by this court, unless it can be considered and treated as an absolute nullity.

" Where an inferior court of special and limited powers, assumes a jurisdiction which it has not, their proceedings are absolutely void and a mere nullity, and of no legal effect, because the whole proceeding is *ceram non judice.* (2 *Wils.* 382.) But the court which made this order is a court of record, and of general jurisdiction over the subject that was before them, and does

not, in my opinion, come within that class of inferior courts of special and limited jurisdiction, whose proceedings can be disregarded and treated as mere nullities for error in judgment, or irregularity in their proceedings. In all the cases in which the proceedings of a court have been held to be a mere nullity, there has been *a want of jurisdiction,* either as to place, persons, or subject matter, upon which they decided; and where there is a want of jurisdiction in either of these respects, all is void. Where there is no jurisdiction at all, as in the case of the *Marshalsea,* (10 *Coke,* 76,) there is no judge, and the proceeding is as nothing: 2 *Wils.* 384. But when the court has a general jurisdiction over the cause, though their proceedings are directed by statute, and are not according to the common law, its judgments, if erroneous, are not void ; and that was the principle of the decision in *Kemper's lessee* v. *Kennedy et al.,* 5 *Cranch,* 173.

" In the present case, the court undoubtedly had a general jurisdiction of the matter before them; and there is no want of jurisdiction as to persons or place. The order of the court may, therefore, be erroneous or irregular, but it is the order of a competent court, made in a matter of which they had jurisdiction ; and until reversed or set aside, cannot be disregarded, or treated as a nullity, when incidentally brought into question in another court. And the contrary doctrine would be extremely dangerous and alarming ; and I am very apprehensive, would shake a great proportion of the titles held under proceedings in the orphans' courts, which there is too much reason to believe, are drawn up with great looseness and irregularity ; and there would be no safety in purchasing at sales under the orders and decrees of these courts, if the title of the purchaser could be impeached for error or irregularity in their proceedings.

" In my opinion, therefore, the order for sale, until reversed or set aside, cannot be disregarded or treated as a nullity, but must be considered as valid and effectual."

It will be seen from this opinion, and the authorities to which it refers, that the principle on which the court acts is perfectly settled, and that the objection to this order is groundless.

[Pittenger's Adm'r v. Pittenger et al.]

As to the order of the orphans' court of Somerset, it is correct in point of form. And the difficulty stated by the defendant's counsel, that the order is made by the orphans' court of a county other than the one in which the letters of administration were granted, is obviated by the plain provision of the act: *Rev. Laws,* 435, s. 19. The application for sale of real estate is to be made, not to the orphans' court in the county where letters of administration were granted, but where the lands lie of which the intestate died seized. There can, therefore, be no doubt of the power of the orphans' court of Somerset to make the order.

Upon the whole case, the complainant is entitled to a decree for a specific performance, according to the prayer of her bill.